**In the Interest of B.N.B., a Child.**

**No. 05–06–01202–CV.**

Court of Appeals of Texas, Dallas.

Feb. 20, 2008.

Johnese White Howard, Dallas, for Appellant.

Lorenzo Brown, DeSoto, for Appellee.

Before Justices MOSELEY, LANG, and MAZZANT.

## OPINION

Opinion by Justice MOSELEY.

This is an appeal of an order entered in a suit affecting the parent-child relationship. The principals involved in this case are B.N.B., a male child born in 2004; his parents, appellant Robert Brooks ("Father") and appellee Thalia Lincoln ("Mother"); and Father's wife, Cheryl Brooks, who is not a party here and was not a party below. Although Father was named sole managing conservator, he appeals because the order contains a provision enjoining Father from allowing B.N.B. to be present with Cheryl unless Father is also present.

The pivotal issue in this appeal is whether, under Texas law, the trial court could order Cheryl to undergo a polygraph examination, and then "take into account" her failure to do so in entering an order based on the best interests of the child. A review of the record makes clear that, unless the answers to those questions are "yes," the trial court abused its discretion

in including the above injunction in the judgment. Because we conclude the answers to those questions are "no" and that any other answers lead inescapably to "trial by polygraph," we modify the trial court's final order by striking the challenged injunction and affirm the order as modified.

## I. BACKGROUND

Pursuant to an agreed order, Father and Mother were joint managing conservators of B.N.B. with equal rights to possession. Father moved to modify the prior order, seeking appointment as sole managing conservator. In response, Mother asserted, among other things, that B.N.B. had been abused while in Father's possession. After a two-day trial, the court appointed Father as sole managing conservator and Mother as possessory conservator. However, the judgment includes language prohibiting Father from "[l]eaving the child alone with Cheryl Brooks for any purpose, for any period of time." The trial court illuminated what it intended by use of the above language:

> What that means, [Father], is that child is not to be alone with Cheryl Brooks unless you are present—I mean not alone at all. *You're supposed to be present at any time that she is with the child.*
>
> *It's not enough to say that her mother is with her; it's not enough to say that her friend is with her; it's not enough to say that any relative is with her. You have to be there if she is going to be with that child.* If you tell me right now you cannot do that, because if you cannot do that I will change this rendition.
>
> [Father]: I can do that.
>
> The Court: If I get the whiff of an idea that this child has been left alone with Cheryl Brooks, *and by alone I mean you're not present,* I will make the switch over to his mother. Do you understand that?

(Emphasis added.)

Father appeals, contending: (1) the evidence is legally and factually insufficient to support the injunction; (2) the evidence is legally and factually insufficient to support an implied finding that Cheryl harmed or abused B.N.B.; (3) the trial court committed fundamental error when it upheld an associate judge's order for Cheryl to take a polygraph examination because the trial court lacked personal jurisdiction over her; and (4) the trial court erred in imposing a sanction on Cheryl through the injunction, and the injunction is not in the best interest of B.N.B.

## II. APPLICABLE LAW AND STANDARD OF REVIEW

The trial court's determination of what serves the best interest of a child will only be reversed for an abuse of discretion. *Peck v. Peck,* 172 S.W.3d 26, 32–33 (Tex. App.-Dallas 2005, pet. denied). *See* TEX. FAM.CODE ANN. § 153.002 (Vernon 2002) ("The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child"). The trial court is given wide latitude in determining the best interests of a minor child. *Peck,* 172 S.W.3d at 33 (citing *Gillespie v. Gillespie,* 644 S.W.2d 449, 451 (Tex.1982)). Under the abuse-of-discretion standard, legal and factual insufficiency are not independent grounds for asserting error, but are merely relevant factors in assessing whether a trial court abused its discretion. *Id.* (citing *Niskar v. Niskar,* 136 S.W.3d 749, 753 (Tex.App.-Dallas 2004, no pet.)). Therefore, in reviewing the substance of the trial court's order, we ask whether the court acted without reference to any guiding rules or

principles, i.e., whether the order was arbitrary or unreasonable. *Id.* (citing *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985)).

When no findings of fact or conclusions of law are requested or filed, an appellate court implies all necessary findings in support of the trial court's judgment. *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 83 (Tex.1992). However, when a reporter's record is included in the record on appeal, the implied findings may be challenged for legal and factual sufficiency. *Roberson v. Robinson,* 768 S.W.2d 280, 281 (Tex.1989) (per curiam). In a legal sufficiency review, we view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 807 (Tex.2005).

## III. THE PROCEEDINGS BELOW

### A. Introduction

After reviewing the record, it is clear the trial court imposed the injunction because Cheryl: (1) failed to undergo a polygraph examination as ordered by the associate judge; and (2) was not present for the second day of the hearing. Neither reason supports the imposition of such an injunction. Further, it is clear that there is no basis for concluding that the best interests of B.N.B. require—or are even consistent with the requirement—that Father be present any time B.N.B. is with Cheryl. Thus, the trial court's action was without reference to any guides or principles, and therefore was arbitrary, unreasonable, and an abuse of discretion.

### B. The Record

#### 1. Best Interests of B.N.B.

There is abundant evidence in the record to support the trial court's determination that it is in B.N.B.'s best interests that Father be named as sole managing conservator. Further, there is undisputed evidence from a number of witnesses that B.N.B. has bonded well with Cheryl; that they have a positive, strong relationship; and that he plays well with Cheryl's son, who is about the same age as B.N.B. There is no evidence that Cheryl has ever harmed or abused B.N.B. or allowed anyone else to harm or abuse him.

There is some evidence that B.N.B. had bruises on his thighs after Mother picked him up from daycare on November 28, 2005. There is no evidence as how any bruises occurred, or that Cheryl had anything to do with them. (Indeed, daycare personnel testified they changed B.N.B.'s diaper that day and did not notice any such bruising.) Although the trial judge noted that she thought B.N.B. was probably hit, she also stated—after hearing all the evidence—that she had "no idea" as to who caused the bruises.

#### 2. Cheryl Brooks

Conversely, the record amply documents the trial court's displeasure with Cheryl and Father (her husband) because Cheryl did not take a polygraph exam and did not appear on the second day of trial, and he did not make her do either. Indeed, it appears polygraph exams in general, and whether or not Cheryl should submit to one in particular, became a focal point of the bench trial.

Before trial, an associate judge ordered Father and Mother take polygraph examinations, which they did apparently without objection. The associate judge then ordered Cheryl to undergo a polygraph exam. When she did not, the associate judge granted Mother's motion to compel Cheryl's polygraph exam. The associate judge's order, entered July 14, 2006, states: "Motion to compel stepmother's

polygraph granted. She must undergo if Father plans to have her around child *or court may take her failure into account."* (Emphasis added.)

Father filed a notice of appeal of this ruling four days later, on the first day of trial. The record is not clear, but it appears that at the beginning of the trial the trial court denied the appeal based on the argument that it was not timely.

In opening argument, Mother's attorney recounted how both Mother and Father had taken polygraph exams, and that Cheryl had not. Mother testified, without objection, that she and Father had both taken and passed polygraph exams.[1]

Father called Dr. Lammers, an psychologist ordered by the court to conduct a psychological evaluation of Mother and Father. After he testified about the results of his psychological evaluations, on cross-examination Mother's attorney asked him about Cheryl's failure to undergo a polygraph exam:

Q: Did you do any type of personality testing on Cheryl Brooks?

A: No.

Q: Were you aware that Cheryl Brooks had refused to take the polygraph ordered by this Court?

[Father's counsel]: Objection, your Honor, to the mention of the polygraph exam with this witness.

The Court: Overruled.

The Witness: No.

Q: If you had learned that she refused to take the polygraph regarding the injuries to the child would that have an effect on your opinions today?

[Father's counsel]: Objection, Your Honor, because that's a misstatement. There is no evidence in front of this Court that [Cheryl] refused to take the polygraph exam, there has been no discussion of that.

The Court: Did she take the exam?

[Father's counsel]: Pardon?

The Court: Did she take the exam?

[Father's counsel]: I'm not privileged to answer your question, your honor.

The Court: [Mother's counsel], did she take the exam?

[Mother's counsel]: No, Your Honor.

The Court: *Do we have any results about the exam?*

[Mother's counsel]: *No, Your Honor.*

The Court: *And there was a recommendation from the associate judge that she take one, correct?*

[Mother's counsel]: *Yes, Your Honor.*

The Court: *All right. That's all we need.*

Q: Would that have any effect on your opinion today?

A: It's hard to say because I didn't evaluate her at all. So I don't really know—I can't really offer an opinion on her.

---

1. She was then asked:
   Q: The Court also ordered Cheryl Brooks to take a polygraph.
   [Father's counsel]: Objection, Your Honor.
   The Court: Overruled.
   Q: Did she take a polygraph?
   A: Not that I know of. I paid $200 toward her polygraph *test* and I haven't heard anything from it.
   On redirect examination, Mother went further into the subject:

   Q: When you paid the money to have the polygraph done, did [Father] ever tell you that his wife would not take the polygraph?
   A: No.
   Q: Has he ever given you a reason for her refusal to take the polygraph?
   A: No.

Q: Well, since she didn't take the polygraph do you think it would have been important for you to do a psychological on Cheryl Brooks?

A: Yes.

(Emphasis added.)

Cheryl's mother testified, among other things, about the good relationship between Cheryl and B.N.B. At the conclusion of her examination by the parties, the trial court asked her: "Do you have any idea why your daughter would decline to take a polygraph examination that was ordered by this Court?"[2]

On the second day of trial, Father's counsel asked the trial court to reconsider its denial of his appeal of the associate judge's order that Cheryl take a polygraph exam. After a short discussion concerning the contents of Rule 4 of the Texas Rules of Civil Procedure, the trial court stated: "I'm happy to hear your appeal but it's going to come out of your time for trial. Let's get started now."

During the hearing on the motion, Father's counsel argued that Cheryl was not a party to the case, the trial court had no jurisdiction over Cheryl, and that it had no authority to order a non-party to submit to a polygraph. After further argument, the trial court denied Father's motion and affirmatively stated that it would consider Cheryl's failure to take a polygraph exam, and Father's failure to make her take a polygraph exam, in determining the best interests of the child:

I agree that this Court doesn't necessarily have jurisdiction over [Cheryl]. But the Court does have jurisdiction over the child, the subject of this suit. And the child's father has elected to leave this child in the care of a third party. And that the father is not willing or is not able to secure the compliance

and the agreement of the primary caretaker of this child, the child who has been the subject of allegations of physical abuse, is very important for this Court to consider.

As such, I will continue to consider it, in the best interest of this child, and in an attempt to protect this child because this child came to this Court, or the subject of this child came to this Court with the allegations of bruising; a CPS report has been made; the child has been taken to the hospital. *Both parties were alleging that the abuse occurred in the care of the other and both of them have passed a polygraph.*

That puts us in a position of trying to figure out where this child was injured. I think that's really important, [Father's counsel]. *And I'm not going to limit this Court's ability to consider the failure of an act to happen, or the failure of the father of this child to secure compliance from the people he has caring for this child.* That's really important.

And that he has not been able to secure that compliance and has not done anything in response to changing who that caretaker is, is also important to this Court.

*So I'm going to deny your relief and I'm going to affirm the ruling of the associate judge. And I'm not imposing any kind of fine or sanction or punishment on [Cheryl] for not complying with the order. Understand that?*

. . . .

*But it is certainly something that I will consider when I'm talking about protecting this child.*

---

**2.** Cheryl's mother answered that she did not.

. . . .

*And if your client does not understand that, then he really has a lot of work to do and a long way to go, doesn't he?*

(Emphasis added.)

Trial then resumed with the continuation of Father's direct examination. At the conclusion of his direct and cross-examination, the court asked him why Cheryl did not take a polygraph exam. Father stated:

> For legal reasons. Because it's about [Mother] and I and I wanted to make sure it stayed that way. And I don't want her—everybody keeps trying to drag her in. I'm the primary caretaker for [B.N.B.] And it should be between [Mother] and I; not Cheryl and I. If [Mother]—can I—

The court asked Father, "And the sole reason she won't take the polygraph is because it's between you and [Mother]? Father replied, "Correct. [Mother]—" The court said, "All right. Thank you. . . . . ."

The court then heard arguments about the striking of deemed admissions by Mother, and Father rested his case.

Mother's counsel then attempted to called Cheryl as a witness. Father's counsel indicated she was not available to testify. Mother's counsel admitted he had not subpoenaed Cheryl. Further, it is undisputed Mother's counsel did not ask for a recess so that he could subpoena Cheryl. After conducting further inquiry, the trial court noted that although Cheryl was not under any obligation to attend the second day of trial, it appeared to her that Father and his counsel were "refusing to cooperate in trying to secure her appearance at court today . . . ." [3]

3. The entire exchange, set forth below, illuminates the trial court's view of Cheryl's absence:

> The Court: [Father's counsel], are you refusing to produce [Cheryl] to testify?
>
> [Father's counsel]: Your Honor, I don't have control over [Cheryl]. [Cheryl] has been to court seven or eight different times. She's always been here.
>
> The Court: [Father], where is your wife today?
>
> [Father]: She's at home with the baby. He's sick.
>
> The Court: Where was the baby yesterday?
>
> [Father]: The baby wasn't sick yesterday. He was at home.
>
> The Court: You're telling me—and remember, you're under oath, you're telling me that your baby is sick today?
>
> [Father]: He is congested. He has some breathing problems, he has breathing problems.
>
> The Court: And this happened overnight?
>
> [Father]: Yes, ma'am. I was up all night; that's why I was late getting here also.
>
> The Court: So you're refusing to produce her; is that correct, [Father's counsel]?
>
> [Father's counsel]: I'm not refusing to produce her, Your Honor. I did not know that she would not be—
>
> The Court: Will you produce her?
>
> [Father's counsel]:—I don't know how I can produce her.
>
> The Court: So you're refusing to produce her?
>
> [Father's counsel]: Your Honor, she is not under subpoena. If [Mother's counsel]—
>
> The Court: I understand, [Father's counsel].
>
> [Father's counsel]:—he should have subpoenaed her. We have subpoenaed every witness we wanted to make sure was here.
>
> The Court: Are you—
>
> [Father's counsel]: He does not follow the Rules of—the Texas Rules of Civil Procedure. You can't just call a witnesses; he has to subpoena her.
>
> The Court:—are you denying that she was sworn in yesterday and placed under the Rule?
>
> [Father's counsel]: Your Honor, I did not turn around and see who was sworn in. I don't know if she was sworn in or not. But I do know she was not subpoenaed

After the conclusion of evidence and the argument of parties, the court announced its decision, stating in part:

> I have concerns about both of you. Really, really important concerns. But I can't take the child away from both of you because I don't think either one of you have abused this child, not based on what I've heard. I believe at some point he was probably hit; by who, I have no idea.
>
> It really concerns me that your wife has not made herself available in these proceedings. In my 13 years of practice, and as a family lawyer and as a judge, I have never seen a stepparent refuse to cooperate in a [proceeding] such as this. Think long and hard about that, about the number of cases that come before me and the number of cases that I've worked with, I've never seen a stepparent so willfully refuse to cooperate.

The court then appointed Father as sole managing conservator and Mother as possessory conservator, and announced the injunction that is the subject of this appeal.

## IV. ANALYSIS

Under the appropriate standard of review, Father argues, among other things, that the evidence is legally and factually insufficient to support any express or implied finding of fact that would in turn support the trial court's conclusion that the injunction is in the child's best interests, and the trial court abused its discretion in including the injunction in its final order.

Based on the record, it is clear the trial court enjoined Father from allowing Cheryl to be with B.N.B. outside of his presence because of Cheryl's failure to take a polygraph exam and her failure to attend the second day of the hearing—and Father's failure to coerce her to do both. There is no basis—none—for concluding the injunction is necessary for, or even contributory to, B.N.B.'s best interests *unless* Cheryl's failure to take a polygraph or attend the second day of trial support an inference that Cheryl may harm or abuse B.N.B. They do not.

The trial court assumed that Cheryl's failure to take a polygraph examination was probative as to whether she harmed or abused B.N.B. or whether she may do so in the future. However, it has long been held that results of a polygraph examination are not admissible in civil or criminal proceedings. *See Posner v. Dallas County Child Welfare Unit of Tex. Dep't of Human Servs.*, 784 S.W.2d 585, 588 (Tex.App.-Eastland 1990, writ denied) (per curiam) (civil proceedings; citing other cases); *Russell v. State*, 798 S.W.2d 632, 635 (Tex.App.-Fort Worth 1990, no pet.) (criminal proceedings). Indeed, the court of criminal appeals has held that polygraph results are inadmissible "[e]ven if the State and the defendant agree and stipulate to use the results of a polygraph at trial. . . .' " *Nethery v. State*, 692 S.W.2d 686, 700 (Tex.Crim.App.1985). *See Nesbit v. State*, 227 S.W.3d 64, 77 (Tex.Crim.App. 2007). The reason for this rule is that polygraph examinations are inherently un-

---

and I do know that she has not been called as a witness in this case.
The Court: Okay. Let the record reflect that [Cheryl] was sworn in yesterday and was placed under the Rule. And she has not been subpoenaed and she was not specifically instructed or ordered to return; I cannot compel her appearance, and it appears that [Father] and his counsel are refusing to cooperate in trying to secure her appearance at court today, which is fine they're under no obligation to do so, but I would like the record to reflect that. There is some later indication in the record that in fact Cheryl was not sworn as a witness. In any event, whether or not Cheryl was sworn as a witness does not affect the analysis of the case.

reliable and tend to be unduly persuasive. *Gregory v. State*, 56 S.W.3d 164, 173 (Tex. App.-Houston [14th Dist.] 2001, pet. dism'd). Further, the law generally forbids admission of evidence that the accused refused a polygraph test. *See Darby v. State*, 922 S.W.2d 614, 625 (Tex.App.-Fort Worth 1996, pet. ref'd).

■ If the trial court can order Cheryl to undergo a polygraph examination and then infer, from her failure to do so, that her being with B.N.B. without Father's presence constitutes a risk of mistreatment to B.N.B., then we have reversed the above rules and instituted trial by polygraph—or rather, trial by failure to take a polygraph—at least in matters involving the best interests of a child. Under the circumstances presented here, Texas law does not permit the trial court to order someone to take a polygraph exam, to consider the results of such an exam, or to infer facts based on the failure to take such an exam.

■ As for Cheryl's absence during the second day of trial, of course the trial court was not required to accept Father's explanation for her absence. However, Cheryl's failure to testify—or Father's failure to call her to testify—is itself not positive evidence that supports an implied finding that she may harm or abuse B.N.B. *See Turner v. Tex. Co.*, 138 Tex. 380, 159 S.W.2d 112, 117 (1942); *Dunn Bros. Pipe Line Contractors v. Caldwell*, 224 S.W.2d 765, 767 (Tex.Civ.App.-Galveston 1949, no writ).[4]

As with any other potential non-party witness, Mother's counsel could have obtained her compulsory attendance through subpoena before trial; if her testimony were so desired he could have sought a recess during trial in order to have such a subpoena issued and served. He did neither. Even the trial court recognized that, having failed to order Cheryl to attend until the trial concluded (or be available to return and testify upon specified notice), her absence during the second day of trial did not breach any obligation to the court.

**4.** Both *Turner* and *Dunn Brothers* were auto accident cases; in each case the defendant did not call as a witness its employee who was (or was presumed to be) driving the defendant's vehicle. In *Turner*, 159 S.W.2d at 117, the Commission of Appeals held the absence of a defense witness does not excuse the plaintiff from presenting evidence supporting his case:

> [E]ven if it were assumed that Hagan was the driver of the automobile, a presumption that his testimony would be favorable to the plaintiff would not relieve the plaintiff from proving his case. The rule is that such presumption does not arise until the party upon whom the burden of proof rests has made a prima facie case.

*Turner* was followed and cited in *Saenz v. Love*, 304 S.W.2d 253, 257 (Tex.Civ.App.-Austin 1957, no writ).

In *Dunn Brothers*, 224 S.W.2d at 767, the Galveston Court of Appeals reached the same conclusion, and explained more clearly the effect of a witness's failure to testify:

> [The truck driver's] failure to testify cannot, of course, be taken to supply the proof necessary to establish that he committed any crime, offense or trespass against the occupants of the sedan. But if appellees have produced on the trial evidence of some probative force to support the inference of the commission by the truck driver of any such crimes, offenses or trespasses, such failure on the part of appellants to place him on the witness stand is a circumstance to be considered in evaluating such probative force, because it is to be presumed that appellants would have produced his testimony or accounted for their failure to do so, if it would have been favorable to them.

*See also Pac. Fin. Corp. v. Rucker*, 392 S.W.2d 554, 558 (Tex.Civ.App.-Houston 1965, no writ) (citing *Dunn Brothers* in support of statement: "If there is evidence of probative force in the record sufficient, if believed, to establish a fact, the failure by a party to call such an employee may be considered in evaluating the existing evidence.").

■ Thus, neither Cheryl's failure to take a polygraph exam or her failure to attend the second day of the hearing supports the trial court's entry of the injunction. Likewise, Father's failure to cooperate to the trial court's satisfaction in getting Cheryl to undergo a polygraph exam or obtaining her presence during the second day of trial is no basis for inferring facts sufficient to support the trial court's imposition of the injunction.

## V. CONCLUSION

Under the circumstances of this case, the trial court could reasonably conclude that the injunction was in the best interest of B.N.B. only if there is legally and factually sufficient evidence supporting an implied finding that Cheryl may harm or abuse B.N.B. The record makes clear that the basis of the trial court's injunction was its displeasure at Cheryl's failure to undergo a polygraph examination and attend the second day of trial, and Father's failure to make her do either to the court's satisfaction. Because these facts do not constitute legally and factually sufficient evidence to support a finding that Cheryl may harm or abuse B.N.B., the trial court's imposition of the injunction constitutes an abuse of discretion. We resolve Father's first and second issues, and that part of his fourth issue relating to the best interest of B.N.B., in his favor. We need not address Father's additional issue or arguments. *See* TEX.R.APP. P. 47.1. We modify the trial court's final order by striking the challenged injunction. As modified, we affirm the trial court's final order.