**Opinion filed July 12, 2012**



In The

# Eleventh Court of Appeals

_____

## No. 11-11-00269-CV

_____

## IN THE INTEREST OF W.B.W., A CHILD

**On Appeal from the 90th District Court**

**Stephens County, Texas**

**Trial Court Cause No. 30,509**

## M E M O R A N D U M   O P I N I O N

The Texas Department of Family and Protective Services brought suit to terminate the parental rights of Rebekah and Charles to their daughter, W.B.W. [1]  The jury found by clear and convincing evidence that termination of the parent-child relationship between Charles and Rebekah and W.B.W. was in W.B.W.'s best interest and that Charles and Rebekah had engaged in acts or conduct that satisfied one or more of the statutory grounds for termination. The trial court entered an order terminating their parental rights, and both parents appeal.  We affirm.

*Background Facts*

Rebekah has three daughters: C.N., who was twenty-one years old at the time of trial; B.N., who was eighteen years old at the time of trial; and W.B.W., who was seven years old at

---

[1]Pursuant to TEX. R. APP. P. 9.8(b), appellants will be referred to as "Charles" and "Rebekah," and the children will be referred to by initials.

the time of trial. C.N. is autistic and functions intellectually at the level of a seven-year-old child. C.N. and B.N. both have the same father, Paul, whom Rebekah married in 1987 and divorced in 1994. Paul is now married to Mindy. Rebekah began dating Charles in 1999 and married him in 2002. At the time Charles and Rebekah married, C.N. was thirteen years old and B.N. was ten years old. In 2004, Rebekah and Charles had W.B.W.

Rebekah testified that in 1999, when she met Charles, she learned that Charles had been convicted of indecency with a child in 1986 for molesting his nine-year-old sister-in-law. Charles provided her with copies of documents related to his 1986 conviction. Rebekah also knew that the police had gone to the preacher of her church and told the preacher that Charles was a pedophile. Rebekah admitted that, outside of seeing the documents that he provided her, she did not investigate Charles's criminal past before bringing him into the home with C.N. and B.N. She also testified that she allowed him to take C.N. and B.N. on trips out of state without her, at a time when she knew that he was a convicted sex offender.

The Texas Department of Family and Protective Services first became involved with the family in 2003, when Paul made a report to CPS about sexual contact between Charles and C.N. C.N. told Paul and Mindy that Charles paid her to massage his penis and that he got into the bathtub with her. Paul reported this information because Charles continued to take both B.N. and C.N. on unsupervised out-of-town trips alone, staying in motels. Rebekah claimed that the unsupervised, overnight trips were for "bonding." She excused the bathing incident by saying that C.N. and Charles both had their bathing suits on and that this was part of something called the "fishy game." Department Investigator Shelley Tinney testified that, throughout the Department's involvement with the family, there were reports that the children were paid to massage Charles and that Rebekah was aware of it.

Rebekah claimed that Charles had already told her that C.N. had "tried something" with him when C.N. made her 2003 outcry to Paul. According to Rebekah's testimony, in 2003, C.N. told her that she had tried to put her hands up Charles's shorts. Rebekah stated, "So nobody is saying that this incident didn't happen; it's just that my daughter was not forced to do it. She was in a sexual air like children do." Rebekah testified that she believed that this was C.N.'s idea. Rebekah stated that she took C.N. to an autism specialist, that she conducted her own investigation into Charles's predilection toward pedophilia, and that she was "pretty sure nothing happened. I mean, I wasn't there, so I can't say. But I was pretty sure." Rebekah also admitted

that she knew that Charles paid C.N. and B.N. to massage him and that she continued to allow C.N. and B.N. to take overnight trips with Charles following the 2003 incident.

The 2003 investigation led to findings of "[r]eason to believe" that Charles committed sexual abuse of C.N. and that Rebekah engaged in neglectful supervision of her. The Department offered services and monitoring and Family Based Safety Services (FBSS). Charles and Rebekah did not complete the services. Although the Department considered removal of C.N. and B.N. due to this incident, it was determined that there was not enough evidence to support removal. Family based services were eventually terminated because Charles and Rebekah refused to cooperate with the Department.

In 2008, the Department received a report of another sexual abuse allegation regarding C.N. C.N. made an outcry at school to her teacher, Michelle McGee, and teacher's aide, Rena Fore. C.N. told McGee and Fore that she was uncomfortable with the way that her stepfather had been touching her for the past two years. McGee called Rebekah and told her that she should come to the school right away. Rebekah arrived at the school within a matter of minutes, and both teachers urged C.N. to tell her mother what she had told them. According to McGee, "the floodgates opened" and C.N. began to tell her mother what Charles had done in graphic detail. She told her mother that Charles had touched her and penetrated her; C.N. said, "He stuck his penis in me." Fore provided a written statement in which she wrote that C.N. provided details concerning how Charles would make her get on the floor and how he would "rub himself and then stick his penis in [her]." C.N. also related that the abuse happened on her overnight trips with Charles. Rebekah's response was to ask, "[W]hy are you doing this?" She then began a rapid-fire interrogation of her daughter. Rebekah told C.N. that she would have to have more details before she would believe her. Throughout the questioning, C.N. "did not miss a beat" in her answers, answering each question the same way and never wavering even though Rebekah's questions were given in a firm tone and seemed designed to get her to change her story. When Rebekah asked "which hole," C.N. pointed to her backside. McGee thought that Rebekah was very upset and seemed angry at C.N. Fore testified that Rebekah also stated, "You'll destroy our family. You will have to live somewhere else. He is innocent." C.N. responded, "It's true." Rebekah did not attempt to console C.N. but instead told the teachers to "send her [home] on the bus" because Rebekah needed to go talk to her husband. McGee was shocked that Rebekah had not comforted C.N. and that she appeared to be defensive of Charles. Fore related that she could not understand Rebekah's obvious anger with C.N. McGee stated that the fact that Rebekah just

3

left C.N. at the school to ride the bus home "was heart sickening" because "[C.N.] had just finally broken all of this and [Rebekah] was gone."

Because C.N. was eighteen at the time, Adult Protective Services intervened, and C.N. was removed from the home. C.N. went to live with her father and step-mother, Paul and Mindy, who were later appointed as her guardians. Mindy testified that she and her husband did not need to renew their guardianship status because it eventually became clear that "nobody was coming for her." Rebekah has since refused to help care for C.N. Mindy also testified that, before C.N. filed a change of address with Social Security, Rebekah refused to send C.N.'s social security disability income checks to Paul and Mindy. Rebekah said that C.N. "made those allegations against my husband and she's going to pay for him an attorney to clear his name." Rebekah told Mindy that she did not think Charles had molested C.N. Rebekah cut all ties to C.N., saying that she did not trust her. Rebekah told her mother, Billie Jo, that she had to "get rid" of C.N. because she did not trust her. Even though Mindy pleaded with Rebekah to write or call C.N., Rebekah refused to send a birthday or holiday card or to communicate in any other way with C.N.

Tinney related that, when one child makes an outcry, it is the policy of the Department to investigate all children in the household. If the other children do not make an outcry, there is not much the Department can do at that time. In 2008, both B.N. and W.B.W. denied being abused. The Department was "[u]nable to determine" whether Charles had sexually abused B.N. or W.B.W., but it did find that there was "reason to believe" that Rebekah had neglectfully supervised both children. The Department again offered services to Charles and Rebekah, but they refused.

After C.N.'s 2008 sexual abuse outcry, Rebekah continued to allow Charles to take B.N. on overnight trips and to be alone with W.B.W. Even though B.N. and W.B.W. did not make outcries during the 2008 investigation, the Department continued to be concerned about their safety. Tinney related that, in her experience as an investigator, it is not unusual for a child to wait for an extended period of time to make an outcry. On May 6, 2008, the Department filed a "Petition for Order to Participate in Services," and on May 16, 2008, the Department filed an "Original Petition for Protection of a Child for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship" concerning B.N. and W.B.W. Charles and Rebekah entered into an Agreed Order for Required Participation in which Rebekah was ordered to participate in a family service plan. Under the terms of the plan, Rebekah was required to

4

undergo psychological evaluation as well as counseling. However, Rebekah did not complete all the tasks required of her. The court did not order Charles to participate in services because doing so might have required Charles to incriminate himself. The Department made an oral motion for the court to dismiss the temporary managing conservatorship of B.N. and W.B.W., and the case was ultimately dismissed.

After years of denying that any abuse had occurred, in March 2010, B.N. made an outcry that Charles had sexually abused her from the age of seven until she was seventeen. B.N. did not report the abuse because she was afraid that Charles would kill her. Charles had pulled a gun on her, threatened to kill her, and threatened to hurt her if she told. B.N. explained that she truly believed that she "would have gotten killed, or very hurt" if she told anyone that Charles was sexually abusing her. Tinney testified that because B.N. had moved out of the home and was self-sufficient, the Department did not file a suit to remove her from Charles and Rebekah's care. W.B.W. was interviewed during the Department's 2010 investigation and, at that time, denied that Charles had abused her. The Department filed an "Original Petition for Protection of a Child, For Conservatorship, and for Termination in a Suit Affecting the Parent-Child Relationship" on March 31, 2010, and W.B.W. was removed from the home. Even though Rebekah's mother and two sisters lived nearby, Rebekah told the Department that there were no relatives with whom W.B.W. could be placed. As a result, the Department placed W.B.W. in the foster home of Donna Dragoo.

Rebekah testified that she told W.B.W. that CPS was going to take her away because B.N. said that Charles had hurt her. However, W.B.W.'s caseworker, Debbie Key, and licensed professional counselor, Andra Ray, both testified that W.B.W. indicated that Rebekah had told her she was being taken away because B.N. had lied about Charles. Rebekah admitted that she refused to answer the Department's questions when it removed W.B.W. Young County Sheriff's Captain Tim Bay testified that Rebekah was also uncooperative during his 2010 investigation of B.N.'s outcry. When asked about her continuing to live with Charles after C.N. and B.N. had made their outcries, Rebekah stated, "I had no reason from my home life and from the years I had been with him and from the things that had been going on in my home that showed any -- that any of it was accurate."

Only one day after being removed from the home, W.B.W. began demonstrating signs of "sexual acting out," which Ray explained as possibly typical of sexual abuse victims. Dragoo testified that she was W.B.W.'s foster mother from April 2, 2010, until November 25, 2010.

Dragoo testified that the day that W.B.W. came into her care, she had emotional problems and was sexually acting out. Specifically, that day Dragoo's oldest daughter came and got her after observing W.B.W. and a younger child playing a game. When Dragoo asked W.B.W. what was going on, she became nervous and then finally admitted that they had been playing "the love game." W.B.W. told Dragoo that the love game is when you are naked and you are in bed kissing and touching each other; she said that she had learned the game from movies that Charles had her watch with him. Dragoo told W.B.W.'s caseworker about the incident.

Dragoo testified that, about two weeks after "the love game incident," W.B.W. made sexually inappropriate comments about wanting to see a man and woman neighbor naked and kissing each other. She again told Dragoo that she had learned these things from the movies she watched with her dad. Key testified that, when W.B.W. described the behavior of the people in the films, she said, "That's what my daddy tells me love is." W.B.W. continued to sexually act out.

During September 2010, Dragoo's four-year-old daughter told Dragoo's sister that W.B.W. had shown her where her "tickle spot" was located and pointed between her legs. Dragoo's daughter also said that W.B.W. had touched her there. Dragoo asked W.B.W. how she knew about her tickle spot, and W.B.W. said: "[I]t would usually happen when my -- when I went to kiss my dad goodnight." She said, "He would pull my pants down and touch me there." And she said, "I would ask him to stop." Dragoo asked what W.B.W. would do when he would not stop. W.B.W. replied, "I would yell for my mom to come in and make him stop" and "[s]ometimes my mom would come in and see him touching me there and she would just say don't touch her there. She doesn't need to know about that." W.B.W. expressed confusion to Dragoo about why her mom had not stopped her dad from touching her. Dragoo testified that W.B.W. made it clear that Charles touched her more than once and that Rebekah saw him do it on more than one occasion. W.B.W. never vacillated from her story that she called for her mother several times and that her mother's only response would be to tell Charles to stop.

Tinney testified that, after W.B.W. made her outcry to Dragoo, she was taken to be interviewed at Virginia House, an area child advocacy center. Forensic Interviewer Teresa Kilpatrick interviewed W.B.W. while Tinney and Captain Bay watched from another room. Tinney related that W.B.W. was able to express that she knew the difference between the truth and a lie. W.B.W. used a drawing to describe how Charles had touched her on her vaginal area with his finger. Tinney testified that, during her interview, W.B.W. said that she did not like her

father because he had "done something wrong to her, touched her private parts." W.B.W. described how her father had pulled her pajama bottoms and panties down while she was lying down and touched her "private parts" with his hand. W.B.W. also stated that she asked Rebekah to make Charles stop and that Rebekah asked Charles to stop touching her. Tinney testified that W.B.W. said that, except for her father, no one else had touched her in her private area or had made her feel uncomfortable. Tinney testified that, during her investigation, she spoke with Dragoo and there was no difference between what Dragoo told her that W.B.W. had said and what W.B.W. said during the forensic interview.

Ray began counseling W.B.W. on April 27, 2010, after W.B.W. started to sexually act out at Dragoo's home. W.B.W admitted to Ray that she had been playing the "love game" with Dragoo's children. Ray explained that, when a therapist is attempting to determine whether a child's sexual acting out is due to abuse, she looks for a pattern in the acting out, as a possible sign that the child has been groomed. "Grooming," she explained, is when "someone has touched or has initiated some kind of early sexual experience with the child." Ray testified that the love game could have been learned in Charles and Rebekah's home. Ray explained that, when a child sexually acts out with another child, particularly one that is younger, that is one sign that sexual abuse has occurred. Ray testified that W.B.W had been pulling down one particular female foster child's pants and touching the other child's pelvic region; the other child was younger than W.B.W. W.B.W also told Ray that she watched movies with Charles and that people in the movies were kissing and were nude. The people in the movies demonstrated the behaviors W.B.W. was displaying.

Ray related that, on October 26, 2010, W.B.W. told her that she had told Dragoo that, after Charles touched her, he said, "Don't tell anyone or I will kill mom." W.B.W. also told Ray that Rebekah had seen Charles touching her and that all Rebekah did was tell him to stop. Ray explained that it was not unusual for a sexually abused child to delay reporting sexual abuse.

Ray testified that, in December 2010, she met with W.B.W. and assisted her in completing a victim impact statement. During the completion of the statement, W.B.W. indicated that she wanted her dad to go to jail and get some help and that she was sad. She indicated that the reason she did not live with her dad was because "he touched my private parts." When asked to write an answer to the statement, "Why I do not live with mom," W.B.W. wrote that it was because "she did not tell." Ray related that W.B.W. continued to express confusion regarding her mother's failure to tell someone about what Charles was doing to her.

7

Ray testified that W.B.W. was consistent when relating what had happened to her and that she did not vacillate.

Ray again met with W.B.W before W.B.W. was to testify against her father at the criminal trial. Ray noted that she was anxious. W.B.W. told her that Rebekah had recently communicated a message to her from Charles. W.B.W. told Ray that Rebekah told her that Charles wanted her to know that he loved her and wanted her to remember a special song that he used to sing to her. W.B.W. did not want to see her dad and was afraid that he could still hurt her. The only contact W.B.W. had with Charles was through her mother, and W.B.W. was very unsettled when she heard the message. In Ray's opinion, these comments were very harmful to W.B.W. Ray met with W.B.W. again after Charles's trial. She said that W.B.W. exhibited "[e]xtreme relief" and that she was proud that she was able to answer the questions that had been asked of her.

Ray said that, if someone were to paint Charles in a positive light, it would endanger W.B.W.'s physical and emotional welfare. Ray testified that she believed a benefit of terminating Rebekah's parental rights to W.B.W. would be that W.B.W. would never have to hear either about how wonderful her dad was or that he never did anything to her. Ray explained that W.B.W. does not trust her mother to take care of her or to look out for her safety. Ray would be very concerned if a third party continually supported Charles and continued to attempt to validate W.B.W.'s relationship with him. W.B.W. still feared Charles, and any contact with him would be traumatic for her. Ray emphasized that it is very important that W.B.W understand that her mother, or whoever is caring for her, believes her and accepts the things she has reported about the sexual abuse. Ray did not believe that one who has regularly visited Charles at the jail and who regularly continued to carry on correspondence with him appeared to be someone who has distanced herself from W.B.W.'s abuser. Ray expressed her belief that, as long as W.B.W's mother continues to have ties to Charles, there is a "very big danger" to W.B.W.

On July 28, 2011, Charles was convicted of the following offenses:

    1. Sexual assault of an adult, C.N., for which he was sentenced to twenty years;

    2. Sexual assault of a child, aggravated sexual assault of a child, and indecency with a child, sexual contact, for the offenses against B.N. and for which he was sentenced to three consecutive life sentences;

3. Indecency with a child, W.B.W., by sexual contact for which he was sentenced to a life term to run consecutively with the other sentences;

4. Aggravated assault with a deadly weapon and indecency with a child, B.M. (a friend of B.N.), by sexual contact, for which Charles was sentenced to two life terms to be served consecutively to the other sentences.

After Charles was arrested for sexually abusing her children, Rebekah visited him in jail ninety-six times. Rebekah admitted that, the week before W.B.W. was to testify against Charles in his criminal trial, Rebekah conveyed the message to W.B.W. from Charles stating that he loved her and wanted her to remember a special song that he used to sing for her. Rebekah admitted she had been told that there was to be no contact between W.B.W. and Charles but that, many times, she had conveyed to W.B.W. that Charles loved her.

Rebekah was arrested on October 14, 2010, for failing to report sexual abuse of a child and was not allowed contact with W.B.W. Rebekah was allowed supervised contact again in February 2011. Visitation was terminated again after Charles's criminal trial due to the communication she had with W.B.W. The only contact that Rebekah has had with her immediate family since Charles's criminal trial has been with him.

Rebekah testified that she had been providing financial support to Charles during his incarceration and that she had visited him approximately 102 times. Rebekah admitted that she had continued to visit Charles after his convictions for the offenses against her children. When asked if she disbelieved the jury's verdict in Charles's seven convictions, Rebekah stated that she did not know whether Charles did it but that she did not believe the jury had enough evidence to convict him. She did not know if she believed her daughters. Up until the morning of trial in this case, Rebekah stated that, if Charles were released from jail, he would be welcome in her home.

Rebekah attended counseling as was required in her service plan, but when asked what she learned during counseling, Rebekah answered that there "really wasn't much to learn" and that she "just stopped going." Key related that, although Rebekah completed her parenting classes, she did not demonstrate the parenting skills that she had learned as required under her service plan. Rebekah was required to work the services in her service plan and demonstrate that she understood those services. Key was concerned about Rebekah's resistance and related that Rebekah did not feel that her children needed any counseling. Key testified that, although Rebekah completed the initial four sessions of counseling, she was not able to show any

"understanding or belief or empathy with the girls that anything happened." Key related that Rebekah did what she was supposed to do on paper but that she was not able to demonstrate what she learned as far as providing a safe, appropriate, and protective home for her children. Rebekah admitted that Dr. Brandon Bates, the psychologist who evaluated her in 2010, told her that he would not recommend counseling because she was "adamant that nothing happened." Dr. Bates also found that Rebekah showed "excessive conformity" to Charles. Rebekah admitted that she really does not want a divorce from Charles and that she will never acknowledge the fact that W.B.W. was sexually abused by him.

Billie Jo is Rebekah's mother. Richard is Billie Jo's husband. Billie Jo testified that, as soon as she learned that W.B.W. was in foster care, she went to the Department and requested that W.B.W. come to live with Richard and her. W.B.W. has been living with Billie Jo and Richard since November 29, 2010. Billie Jo stopped working in order to care for W.B.W. full time. Billie Jo testified that W.B.W is doing "great" and that she is excelling at school. Billie Jo related that W.B.W. has had some problems with nightmares about Charles coming to get her, particularly around the time of the criminal trial, and that she has been there to comfort W.B.W. W.B.W. goes to counseling on a regular basis. Billie Jo and Richard are participating in the Fostering Connections program and have completed all of the required classes.

Both Billie Jo and Richard are in excellent health. Richard related that W.B.W. is busy with horseback-riding lessons, soccer, and junior cheerleading at school. He described how he and W.B.W. read every evening, and he indicated that she is at a fourth grade reading level even though she is just entering the second grade. Billie Jo and Richard testified that they have ensured that W.B.W. has regular contact with her sisters and other family members. Billie Jo testified that she and Richard can provide W.B.W. with a stable, loving home and that they are willing to protect her. They also plan on sending her to college. Billie Jo related that W.B.W. no longer asks about her mother and recently asked Billie Jo, "Granny, can I live with you forever?" Billie Jo expressed that she and Richard can meet W.B.W.'s emotional needs. Mary Jo Williams, a CASA worker assigned to W.B.W. since April 2010, has observed W.B.W. in Billy Jo and Richard's home and testified that she was "very happy. She had a horse and a dog and just seemed very happy."

On October 31, 2011, the parental rights of Charles and Rebekah were terminated under Family Code Section 161.001 as to the child, W.B.W. Charles's rights to W.B.W. were

terminated under Section 161.001(1), subsections (A), (D), (E), (L), (N), (O), and (Q). TEX. FAM. CODE ANN. § 161.001(1)(A), (D), (E), (L), (N), (O), (Q) (West Supp. 2011). Rebekah's rights to W.B.W. were terminated under subsections (D) and (E). Section 161.001(1)(D), (E). The jury also found that termination of Charles's and Rebekah's parental rights to W.B.W. is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(2) (West Supp. 2011). The trial court appointed the Department as the child's managing conservator and intervenors, Billie Jo and Richard and "Ann,"[2] as the child's joint possessory conservators.

### Rebekah's Appeal

In her first issue, Rebekah challenges the legal and factual sufficiency of the evidence to support the jury's findings that Rebekah either (1) knowingly placed or knowingly allowed W.B.W. to remain in conditions or surroundings that endangered her physical or emotional well-being or (2) engaged in conduct or knowingly placed W.B.W. with persons who engaged in conduct that endangered W.B.W.'s physical or emotional well-being. In her second issue, Rebekah challenges the legal and factual sufficiency of the evidence to support the jury's finding that it was in the best interest of W.B.W. for Rebekah's parental rights to be terminated.

### Standard of Review

Texas courts have long recognized that the natural right existing between a parent and child is of "constitutional dimensions." *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976). There is a strong presumption that the best interest of a child is served by keeping the child with the natural parent. *In re G.M.*, 596 S.W.2d 846 (Tex. 1980). Thus, involuntary termination proceedings and statutes are strictly scrutinized in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20–21 (Tex. 1985).

Due process requires that the grounds for termination be established by clear and convincing evidence. This requires a measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX. FAM. CODE ANN. § 101.007 (West 2008); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 31 (Tex. 1994).

When conducting a legal sufficiency review, we review the entire record in the light most favorable to the finding and determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *City of Keller v. Wilson*, 168 S.W.3d 802, 817

---

[2]"Ann" is W.B.W.'s paternal grandmother.

(Tex. 2005); *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the factfinder resolved disputed facts in favor of its finding. *Phillips v. Tex. Dep't of Protective & Regulatory Servs.*, 149 S.W.3d 814, 817 (Tex. App.—Eastland 2004, no pet.). We must also disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *In re J.F.C.*, 96 S.W.3d at 266.

When conducting a factual sufficiency review, we review the entire record, including evidence in support of and contrary to the judgment, and give due consideration to evidence the jury could have found to be clear and convincing. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). We then determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations. *Id.* We also consider whether any disputed evidence is such that a reasonable factfinder could not have resolved that evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266.

*Grounds for Termination*

To terminate parental rights, the proponent must prove by clear and convincing evidence that a parent committed one or more of the acts or omissions set forth in Section 161.001(1) and that termination of parental rights is in the child's best interest. Section 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Section 161.001(1)(D) provides that the court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. Section 161.001(1)(E) allows for termination of parental rights if the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child."

Under subsection (D), it is necessary to examine evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being. *In re D.T.*, 34 S.W.3d 625, 630 (Tex. App.—Fort Worth 2001, pet. denied) (op. on reh'g). Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re D.O.*, 338 S.W.3d 29, 33 (Tex. App.—Eastland 2011, no pet.). Additionally, termination under Section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of

conduct by the parent is required. *In re D.T.*, 34 S.W.3d at 634; *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.).

"Endanger" means more than a threat of metaphysical injury or a less-than-ideal environment: the conduct need not actually injure the child nor is it necessary that the conduct be directed at the child. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Conduct" includes not only acts but omissions. *In re D.O.*, 338 S.W.3d at 33.

It is "beyond question" that sexual abuse constitutes conduct that endangers a child's physical or emotional well-being. *In re R.W.*, 129 S.W.3d 732, 742 (Tex. App.—Fort Worth 2004, pet. denied). "[E]vidence of sexual abuse of one child is sufficient to support a finding of endangerment with respect to other children." *Id.* Section 161.001(1)(E) does not require actual injury before a parent's parental rights may be terminated. *In re D.O.*, 338 S.W.3d at 34. Evidence that a parent continued to live with, or left the children in the care of, a person whom she knew had sexually abused the children in the past supports termination under Section 161.001(1)(D). *In re Tidwell*, 35 S.W.3d 115, 118–20 (Tex. App.—Texarkana 2000, no pet.); *In re L.S.*, 748 S.W.2d 571, 575 (Tex. App.—Amarillo 1988, no writ). A parent's refusal to leave a situation that exposes a child to the risk of sexual abuse constitutes "conduct" that supports termination of parental rights under Section 161.001(1)(E). *In re R.G.*, 61 S.W.3d at 668–70; *In re Tidwell*, 35 S.W.3d at 119–20; *In re J.M.C.A.*, 31 S.W.3d 692, 698 (Tex. App.—Houston [1st Dist.] 2000, no pet.); *In re A.C.*, 758 S.W.2d 390, 393 (Tex. App.—Fort Worth 1988, no writ). Evidence that a parent knew or should have known of the risk that the child would be sexually abused was sufficient to support termination under subsections (D) and (E). *See In re A.B.*, 125 S.W.3d 769, 775 (Tex. App.—Texarkana 2003, pet. denied); *In re Tidwell*, 35 S.W.3d at 118. Sexual abuse of one child in a home is sufficient to support the finding that other children in the home who were not sexually abused were allowed to remain in "conditions or surroundings" that endangered the children's emotional or physical well-being. *In re L.C.*, 145 S.W.3d 790, 799–800 (Tex. App.—Texarkana 2004, no pet.); *In re Tidwell*, 35 S.W.3d at 120.

*Analysis*

In this case, the Department presented evidence that Rebekah's actions and her failure to act endangered W.B.W. Although the Department had to establish only one ground for termination, the evidence was legally and factually sufficient to support termination under either

subsection (D) or (E) of Texas Family Code Section 161.001(1). *See In re J.L.*, 163 S.W.3d at 84 (petitioner must establish only one ground listed under Section 161.001(1)).

Rebekah allowed Charles to be alone with her children knowing that he had been convicted of indecency with a child. She continued to allow Charles to be alone with W.B.W. and her other children after the children made sexual abuse allegations against him. Rebekah admitted that she knew Charles had paid C.N. and B.N. to massage him and that she allowed him to take them individually on overnight trips even after it was alleged that C.N. touched Charles's penis on one of these trips. The evidence reflects that Rebekah saw Charles sexually abusing W.B.W. on multiple occasions and did not stop the abuse or otherwise protect W.B.W. Rebekah also communicated a message from Charles to W.B.W.—directly before W.B.W. was to testify against him at his criminal trial—after having been ordered not to mention Charles to W.B.W. Rebekah has refused to acknowledge Charles's sexual abuse of W.B.W. or her other children despite his multiple convictions for committing sexual abuse against them, and she has maintained a relationship with and has supported Charles since he has been incarcerated.

The evidence shows that, from the outset, Rebekah has maintained an attitude of willful ignorance about her husband's proclivities. Rebekah's treatment of C.N. sent a message to her other children that outcries would be ignored and that outcriers would be shunned. She set an impossible bar for her children to meet, stating that she would have to see the abuse with her own eyes in order to believe it. This was an unattainable standard because Rebekah frequently allowed her husband unsupervised access to her children. The level of access allowed was such that others found it unseemly. This created an environment where abuse was allowed to flourish unchecked.

For purposes of a factual sufficiency review, we must consider whether any disputed evidence is such that a reasonable factfinder could not have resolved that evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. Rebekah maintains that she was unaware of any abuse occurring in her home. However, some evidence showed that Rebekah saw W.B.W. being abused and did nothing. The jury, as the sole judge of credibility, was entitled to resolve the evidence in favor of its finding. TEX. CODE CRIM. PROC. ANN. art. 36.13 (West 2007), art. 38.04 (West 1979). The jury was free to believe or disbelieve all or any part of any witness's testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986).

Even if Rebekah had not seen W.B.W. being abused with her own eyes, the jury may have found that she knew at least of the risk of sexual assault. Rebekah argues that the

14

Department allowed the children to return to the home after the 2003 and 2008 investigations. "If the Department, with all its many resources, could not or would not do anything about a perceived threat," she reasons, "how could Appellant have know[n] what was happening?" It is the burden of a parent to provide a safe environment for her children, regardless of the ability of the Department to make its case for removal. Rebekah states that, if Charles was able to deceive the Department, then she should not be faulted for being deceived as well. However, the Department was not deceived. The 2003 investigation was resolved with a finding of "reason to believe" that abuse had occurred. In 2008, the finding was "unable to determine" abuse of B.N. and W.B.W. and "reason to believe" that Rebekah had been neglectful in supervision. The jury may reasonably have found that Rebekah's failure to protect W.B.W. from Charles under these circumstances constitutes, at the least, endangerment by omission. *In re M.J.M.L.*, 31 S.W.3d 347, 350 (Tex. App.—San Antonio 2000, pet. denied). The jury may have found that, if she did not actually know about the abuse, then she was at least aware of the potential for danger that W.B.W. would be sexually abused and ignored that risk. This is sufficient to support termination under subsections (D) and (E). *See In re A.B.*, 125 S.W.3d at 775; *In re Tidwell*, 35 S.W.3d at 118. The disputed evidence is not such that a reasonable factfinder could not have resolved that evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266.

The evidence is both legally and factually sufficient to support the jury's finding of termination pursuant to Rebekah's conduct in violation of Family Code Section 161.001(1)(D) and (E). Rebekah's first issue is overruled.

### *Best Interest of the Child*

In her second issue, Rebekah argues that the evidence was legally and factually insufficient to show that termination was in the best interest of W.B.W. To terminate the parent-child relationship, the jury must also find that termination is in the best interest of the child. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Best interest does not require proof of any unique set of factors. *In re W.E.C.,* 110 S.W.3d 231, 240 (Tex. App.—Fort Worth 2003, no pet.). But courts may use the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include, but are not limited to, (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the

agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Id.* Additionally, evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *In re C.J.F.*, 134 S.W.3d 343, 354 (Tex. App.—Amarillo 2003, no pet.).

The evidence that Rebekah endangered W.B.W.'s physical and emotional well-being, discussed above, also supports the finding that termination was in W.B.W.'s best interest. Additionally, the jury could reasonably consider Rebekah's refusal to believe her children, even after Charles was convicted by a jury of five counts of abuse against them, as evidence of poor parenting skills. Nearly all of the witnesses at the trial expressed concern about Rebekah allowing or encouraging W.B.W.'s continued contact with Charles in the future via letters or visits to the prison. Rebekah's attempted emotional blackmail of W.B.W. on the eve of her testimony against Charles in his criminal case could also be viewed as a cause for concern for W.B.W.'s future emotional well-being if left in Rebekah's care. By conveying this message from Charles, Rebekah violated a court order that prohibited her from discussing Charles with W.B.W. and inflicted significant emotional damage on W.B.W., who lived in fear of her father and still required a great deal of healing.

The Department and several other witnesses made it clear that Rebekah will almost certainly expose W.B.W. to Charles. Dr. Bates and Ray both attested to the devastating effect that contact with Charles would have on W.B.W. Rebekah's refusal to cut ties with Charles herself, coupled with her testimony that she would allow W.B.W. to visit Charles when W.B.W was older, could also be seen as evidence of poor judgment and faulty parenting skills. Rebekah admitted that she will never acknowledge that W.B.W. was abused by Charles. Ray testified that it is critical that W.B.W. be believed by her caregiver and that, even if there is no mention of Charles, W.B.W. is intelligent and perceptive and would be able to determine that Rebekah did not believe her. Several witnesses agreed that Rebekah was incapable of being protective of W.B.W. in the future.

On the other hand, there was evidence that the placement with Billie Jo and Richard was an appropriate one. Several witnesses agreed that Billie Jo and Richard could meet W.B.W.'s present and future physical and emotional needs and would continue to provide her with a loving and nurturing home in which she could achieve permanency. Although she expresses a desire to

16

be with her mother, W.B.W. also vocalizes a wish to remain with Billy Jo and Richard. By all accounts, W.B.W. is happy with Billy Jo and Richard, and she is slowly recovering from her ordeal.

The evidence is legally and factually sufficient to support the finding that the termination of Rebekah's parental rights was in the best interest of W.B.W. Accordingly, Rebekah's second issue is overruled.

*Charles's Appeal*

In his first four issues, Charles attacks the trial court's decisions to allow or exclude evidence. He objects to the admission of evidence of his prior convictions and of testimony that he asserts was privileged as a communication to a member of the clergy. He objects to the exclusion of evidence of his polygraph results and psychological evaluation. In his fifth issue, Charles asserts that the trial court erred by refusing his requested instruction to the jury that the court delineate his rights under the Fifth Amendment. *See* U.S. CONST. amend. V. Only in his first issue does Charles attack a specific ground for termination, but we will address his other issues as well by interpreting his argument to be that the trial court's error prejudiced the outcome as to each and every ground for termination.

*Standard of Review*

Whether the trial court erred in admitting or excluding evidence depends upon whether it abused its discretion. *In re K.S.*, 76 S.W.3d 36, 42 (Tex. App.—Amarillo 2002, no pet.). Furthermore, a trial court abuses its discretion when the decision fails to comport with controlling rules and principles. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). Yet, should an evidentiary ruling constitute an abuse of discretion, the case will not be reversed unless the error is harmful, that is, unless it probably caused the rendition of an improper judgment. *Id.*; *see* TEX. R. APP. P. 44.1(a). This normally obligates the complainant to show that the judgment turned on the particular evidence excluded or admitted. *In re K.S.*, 76 S.W.3d at 42.

The decision of whether to submit a particular instruction is reviewed for an abuse of discretion. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *In re K.S.*, 76 S.W.3d at 42; *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003). The essential inquiry is whether the instruction or definition aids the jury in answering the questions. *Lee v. Lee*, 47 S.W.3d 767, 789 (Tex. App.—Houston [14th Dist.] 2001, pet. denied);

*see also Sterling Trust Co. v. Adderley*, 168 S.W.3d 835, 842–43 (Tex. 2005). A court is given wide latitude to determine the sufficiency of explanatory instructions and definitions. *Plainsman Trading Co. v. Crews*, 898 S.W.2d 786, 791 (Tex. 1995). A trial court's error in refusing an instruction is reversible if it "probably caused the rendition of an improper judgment." Rule 44.1(a); *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002).

### *Prior Convictions*

In his first issue, Charles asserts that the trial court erred in allowing evidence before the jury of his felony convictions based upon the same conduct that was the subject of the termination action because the convictions were pending appeal. Testimony regarding Charles's seven convictions for various crimes perpetrated against his daughter, stepdaughters, and an additional juvenile was allowed into evidence over the running objection of his attorney. The Austin court of appeals has addressed whether convictions must be final before being admissible in a termination suit, and the Amarillo court of appeals has followed that decision. *Rian v. Tex. Dep't of Family & Protective Servs.*, No. 03-08-00155-CV, 2009 WL 2341868, at *1–2 (Tex. App.—Austin July 31, 2009, pet. denied) (mem. op.); *see In re T.C.C.H.*, No. 07-11-00179-CV, 2011 WL 6757409, at *9 (Tex. App.—Amarillo Dec. 22, 2011, no pet.) (mem. op.). Although the *Rian* court was concerned with Section 161.001(1)(L) and Charles specifically complains of the admissibility of the evidence for purposes of subsection (Q), we find that *Rian* is dispositive. Section 161.001(1)(L) is a ground for termination that is based on the parent's conviction of any of an enumerated list of specific offenses. Section 161.001(1)(Q) is a ground for termination that is based on *any* conviction that prevents the parent from caring for his child for at least two years from the date of the filing of the petition for termination. Neither section explicitly requires that the prior conviction be final. Here, subsections (L) and (Q) were both among the grounds for termination submitted to the jury.

Like the appellant in *Rian*, Charles contends that the evidence of his convictions was inadmissible because the convictions were being appealed and therefore were not final. He cites TEX. R. EVID. 609, 803(22) and *Juan A___ v. Dallas Cnty. Child Welfare*, 726 S.W.2d 241, 245 (Tex. App.—Dallas 1987, no writ), for this proposition. As the Department has noted, *Juan A___* was decided ten years prior to the enactment of the mandatory dismissal deadline codified as Family Code Section 263.401. TEX. FAM. CODE ANN. § 263.401 (West 2011). The *Rian* court found support for its decision in the strict timelines of Section 263.401 for pursuing a

termination. We find the Austin court's reasoning regarding this timeline to be especially persuasive:

> The strict time requirements [in Section 263.401] for prosecuting termination cases to finality . . . add contextual weight to the view that the legislature intended non-final convictions to be admissible in termination cases. It is probable that criminal prosecutions and terminations based on the same behaviors will proceed in parallel, that evidence of the trial court's resolution of the criminal proceeding will be useful to the court considering the termination proceeding, and that the time constraints will mean that the termination proceeding will often occur before appeals in the criminal proceeding are exhausted.

*Rian*, 2009 WL 2341868, at *2. Here, as in *Rian*, Rules of Evidence 609 and 803(22) do not apply because the evidence was not being used to impeach but for another purpose, to show that parental rights should be terminated. *Rian*, 2009 WL 2341868, at *1. The court found it significant that the legislature included no finality requirement in Section 161.001 when deciding that certain criminal convictions committed under particular circumstances would support termination of parental rights. *Id.* It "conclude[d] that the legislature intended to permit termination under section 161.001 based on conviction without regard to whether appeals were exhausted." *Id.* We agree. We find the analysis of the *Rian* court dispositive of Charles's challenge, and we hold that the trial court did not abuse its discretion. Accordingly, we overrule Charles's first issue.

### *Communications-to-Clergyman Privilege*

In his second issue, Charles argues that the trial court erred in allowing evidence before the jury that consisted of his communications with a clergyman, in violation of the communications-to-clergyman privilege of TEX. R. EVID. 505. The court allowed Pastor Wayne Harden to testify about certain conversations that took place between himself and Charles and also about things that Pastor Harden had witnessed.

A person has a privilege to refuse to disclose and to prevent another from disclosing a confidential communication by the person to a member of the clergy in the member's professional character as a spiritual adviser. Rule 505(b). However, in a proceeding regarding the abuse or neglect of a child, evidence may not be excluded on the ground of privileged communication except in the case of communications between an attorney and client. TEX. FAM. CODE ANN. § 261.202 (West 2008). Further, the legislature chose the broad term "proceeding,"

indicating the applicability of Section 261.202 to any proceeding, criminal or civil. *See* Section 261.202.

Because this was a proceeding regarding the abuse or neglect of a child, Charles was not entitled to invoke the clergy privilege. Furthermore, the privilege, were it applicable, only extends to communications addressed to a clergyman in his professional capacity as a spiritual advisor, not to every private communication made to a clergy member. Rule 505(b); *Kos v. State*, 15 S.W.3d 633, 639–40 (Tex. App.—Dallas 2000, pet. ref'd). Charles's relationship with Pastor Harden extended beyond that of clergyman and church member. According to Pastor Harden, the two were at one time friends and colleagues. The communication in question was not addressed to Pastor Harden in his professional capacity as a spiritual advisor. The communication between the two men took place during a car ride on their way home from an out-of-town job for Charles's mold remediation company. Charles did not preface his comments with any request for secrecy or spiritual guidance. According to Pastor Harden, he "[d]idn't say, Preacher, I want to tell you something in private"; he merely began "popping off" with a sexually explicit story—something he had also done on other occasions. It is clear that Pastor Harden was not acting in his role as a spiritual advisor; his response to Charles was not to give advice but to tell him to "[s]hut [his] mouth" and to tell him that he did not "want to hear that mess." The privilege does not apply, and even if it did, the communications at issue would not be protected by it. Charles's second issue is overruled.

*Polygraph Testing*

In his third issue, Charles contends that the trial court erred in excluding evidence of his polygraph test results or any discussion regarding that examination. In 2003, after C.N.'s outcry, Rebekah personally investigated the accusations against Charles. She took Charles to several professionals at her own expense, and Charles underwent a polygraph test and a psychological evaluation. Rebekah's counsel made an offer of proof regarding her 2003 investigation. The objections made to this evidence were that it was hearsay, that it would tend to confuse the jury, and that evidence regarding polygraph testing is inherently unreliable. The trial court ruled that the results of the polygraph were inadmissible. In addition, the court ruled that Rebekah could discuss her investigation to show that she took some action but that there would be no mention at all of any polygraph test. Rebekah testified that in 2003 she conducted her own investigation, hired a psychologist, and was satisfied by her findings.

20

At trial, Charles argued that evidence of the polygraph examination was not hearsay because it was not being offered for the truth of its findings. This evidence, he contends, was merely offered to rebut the Department's assertion that neither parent made efforts to determine whether he had acted inappropriately with the children. "[R]eferences to a polygraph test, or to its results, are inadmissible for *all* purposes." *Martinez v. State*, 272 S.W.3d 615, 626 (Tex. Crim. App. 2008) (emphasis added). They are inadmissible in civil cases as well as criminal. *Posner v. Dallas Cnty. Child Welfare Unit of Tex. Dep't of Human Servs.*, 784 S.W.2d 585, 588 (Tex. App.—Eastland 1990, writ denied); *In re B.N.B.*, 246 S.W.3d 403, 410 (Tex. App.—Dallas 2008, no pet.). The reason for this rule is that polygraph examinations are inherently unreliable and tend to be unduly persuasive. *Gregory v. State*, 56 S.W.3d 164, 173 (Tex. App.—Houston [14th Dist.] 2001, pet. dism'd). The trial court allowed Rebekah to testify that she had taken investigative action to determine whether Charles had behaved inappropriately in 2003. The jury was not, as appellant contends, left with the impression that the parents had done nothing to dispute the 2003 allegations. The trial court did not abuse its discretion. Charles's third issue is overruled.

*Psychological Evaluation*

In his fourth issue, Charles argues that the trial court erred in excluding evidence of his psychological evaluation, which included an evaluation of his predilection to pedophilia. During the offer of proof, the Department objected to the admission of Charles's psychological evaluation on the basis that it contained hearsay. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." TEX. R. EVID. 801(d). Charles did not argue that the evidence fit within an exception to the hearsay rule but, rather, that it was not hearsay because it was not being offered for the truth of the matter asserted.

Charles contends that he was not attempting to prove the reliability or truth of the results of the evaluation but was merely offering the fact that he had undergone an evaluation to rebut the Department's assertion that neither parent made efforts to determine whether he had acted inappropriately with the children. However, the fact that he had undergone an evaluation was not what was excluded by the trial court. Although even the mention of the word "polygraph" was forbidden by a motion in limine, discussion of the psychological evaluation was not forbidden by the trial court. The court specifically excluded the documents associated with the psychological evaluation but ruled that Rebekah could testify about what action she took. When

Charles's counsel asked whether he could ask about what *specific* steps Rebekah had taken, the trial judge replied, "I'm not going to tell you what to ask her and not ask her." Rebekah was allowed to testify that she had taken investigative action, including hiring a psychologist. She was also allowed to testify generally that Charles had undergone testing by professionals, stating: "It was some good testing by some qualified people, and it gave me some peace." Charles's counsel was permitted to ask Rebekah, "Now, so you get through all this [in] 2003, all the testing and what you've done. Do you feel at this point that through your own investigation that you believe that you made a conclusion that nothing happened in 2003?" However, Rebekah was never asked specifically about a "psychological evaluation." Thus, the exclusion of the document itself is the only issue that Charles can complain of on appeal.

Because Charles's stated reason to admit the evidence could be accomplished by permitting Rebekah to testify concerning actions she took to investigate in 2003, the trial court was within its discretion to find that there was no other purpose for which the evaluation could have been offered than for the truth of its contents. In addition, the trial court was within its discretion to decide that the evaluation itself would have been cumulative of Rebekah's testimony and that admitting the evaluation with a limiting instruction would have needlessly confused the jury. *See* TEX. R. EVID. 403. The trial court did not abuse its discretion. Charles's fourth issue is overruled.

*Jury Instruction*

In his fifth and final issue, Charles asserts that the trial court erred by refusing his request that, as a part of the court's jury charge, the trial court instruct the jury as to his rights under the Fifth Amendment to the United States Constitution. Charles's trial counsel did not object to the trial court's instruction regarding what inference the jury was allowed to draw from Charles's invocation of his Fifth Amendment rights. However, counsel requested that, in addition to this instruction, the court also "set forth that [Charles] had the right to take the Fifth Amendment under our laws of the United States." On appeal, Charles argues that his Fifth Amendment rights should have been delineated in the charge in order to explain to the jury what rights were accorded him.

However, counsel did not tender an objection and a substantially correct instruction in writing to the trial court. Texas Rule of Civil Procedure 278 requires a party to request and tender to the trial court a substantially correct instruction in writing when the trial court omits a requested instruction from the jury charge. TEX. R. CIV. P. 278; *Medistar Corp. v. Schmidt*, 267

22

S.W.3d 150, 159 (Tex. App.—San Antonio 2008, pet. denied); *McCarthy v. Wani Venture*, 251 S.W.3d 573, 585–86 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citing *Yellow Cab & Baggage Co. v. Green*, 277 S.W.2d 92, 93 (Tex. 1955)). Merely dictating a requested instruction to the court reporter is not sufficient to support an appeal based on the trial court's refusal to submit the instruction. *Hartnett v. Hampton Inns, Inc.*, 870 S.W.2d 162, 165 (Tex. App.—San Antonio 1993, writ denied). If a party fails to tender a substantially correct instruction in writing, any error by the trial court in not submitting the instruction to the jury is waived. *Medistar Corp.*, 267 S.W.3d at 159; *Hartnett*, 870 S.W.2d at 166.

Here, because there was no offer of a substantially correct instruction in writing, we are unable to determine whether the proposed instruction amounts to a substantially correct instruction. Dictating to the court reporter a requested instruction is insufficient to preserve error. *See Hartnett*, 870 S.W.2d at 165. It follows that, when there was *no* suggested instruction given, only the request that rights be "set out," error was not sufficiently preserved. Otherwise, the appellate court would be required to ascertain for itself the language of the proposed instruction based on a reading of the transcript of Charles's objections to the trial court. The record does not reflect that Charles submitted to the court in writing a substantially correct jury instruction. Therefore, we conclude that Charles has waived any error regarding his requested instruction. Charles's fifth issue is overruled.

The order of the trial court is affirmed.


ERIC KALENAK
JUSTICE


July 12, 2012

Panel consist of: Wright, C.J.,
McCall, J., and Kalenak, J.

23